# EXHIBIT B

CASE 0:11-cv-01452-MJD -AJB   Document 17-2   Filed 07/06/11   Page 1 of 17

```
              IN THE UNITED STATES BANKRUPTCY COURT
                   FOR THE DISTRICT OF DELAWARE

IN RE:                      )     Case No. 08-13141(KJC)
                            )
                            )
TRIBUNE COMPANY             )     Chapter 11
                            )
                            )     Courtroom 5
                            )     824 Market Street
           Debtors.         )     Wilmington, Delaware
                            )
                            )     March 22, 2011
                            )     10:00 a.m.

                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE JUDGE KEVIN J. CAREY
                    UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For Debtors:                Sidley Austin, LLP
                            BY: JAMES CONLAN, ESQ.
                            BY: KEN KANSA, ESQ.
                            BY: JESSICA BOELTER, ESQ.
                            One South Dearborn
                            Chicago, IL 60603
                            (312) 853-7000

                            Cole, Schotz, Meisel, Forman
                            & Leonard, P.A.
                            BY: NORMAN PERNICK, ESQ.
                            500 Delaware Ave., Ste. 1410
                            Wilmington, DE 19801
                            (302) 652-3131

ECRO:                       AL LUGANO

Transcription Service:      DIAZ DATA SERVICES
                            331 Schuylkill Street
                            Harrisburg, Pennsylvania 17110
                            (717) 233-6664
                            www.diazdata.com

Proceedings recorded by electronic sound recording;
transcript produced by transcription service
```

```
APPEARANCES:
(Continued)

For Morgan Stanley:         Barnes & Thornburg
                            BY: DAVID POWLAN, ESQ.
                            11 South Meridian Street
                            Indianapolis, IN  46204
                            (317) 727-2211
For Angelo Gordan/Oaktree/
Credit Agreement Lenders:   Young Conaway Stargatt &
                            Taylor
                            BY: BLAKE CLEARY, ESQ.
                            BY: ROBERT BRADY, ESQ.
                            The Brandywine Building
                            1000 West Street, 17th Floor
                            Wilmington, DE 19801
                            (302) 571-6600

For Merrill Lynch:          Potter Anderson & Carroon, LLP
                            BY: LAURIE SILVERSTEIN, ESQ.
                            Hercules Plaza
                            1313 North Market Street
                            6th Floor
                            Wilmington, DE  19801
                            (302) 984-6033

For Barclays:               DLA Piper
                            BY: MICHELLE MARINO, ESQ.
                            1251 Avenue of the Americas
                            New York, NY  10020-1104
                            (212) 335-4500

For JP Morgan:              Davis Polk & Wardwell
                            BY: ELLIOT MOSKOWITZ, ESQ
                            BY: DAMIEN SCHAIBLE, ESQ.
                            450 Lexington Avenue
                            New York, NY 10017
                            (212) 450-4000

                            Richards Layton & Finger
                            BY: BOB STEARN, ESQ.
                            One Rodney Square
                            920 North King Street
                            Wilmington, DE  19801
                            (302) 651-7700
```

3

```
APPEARANCES:
(Continued)

For Official Committee
of Unsecured Creditors:     Landis, Rath & Cobb
                            BY: DANIEL B. RATH, ESQ.
                            919 Market Street, Suite 1800
                            Wilmington, DE 19801
                            (302) 467-4400

                            Chadbourne & Parke, LLP
                            BY: DAVID LEMAY, ESQ.
                            BY: HOWARD SEIFE, ESQ.
                            30 Rockefeller Plaza
                            New York, NY 10112
                            (212) 408-5100

                            Zuckerman Spaeder
                            BY: JAMES SOTTILE, ESQ.
                            1800 M Street, NW
                            Suite 1000
                            Washington, DC 20036
                            (202) 778-1800

For Aurelius:               Akin Gump Strauss Hauer & Feld
                            BY: DANIEL GOLDEN, ESQ.
                            BY: PHIL DUBLIN, ESQ.
                            One Bryant Park
                            New York, NY 10036
                            (212) 872-1000

                            Lerman Senter, PLLC
                            BY: MEREDITH SENTER, ESQ.
                            2000 K Street, NW, Ste. 600
                            Washington, DC 20006
                            (202) 429-8970

For U. S. Trustee:          United States Trustee
                            BY: DAVID KLAUDER, ESQ.
                            844 King Street, Ste. 2207
                            Wilmington, DE  19801
                            (302) 573-6491
```

4

```
APPEARANCES:
(Continued)

For Software AG:            Phillips Goldman & Spence
                            BY: STEPHEN A. SPENCE, ESQ.
                            1200 Broom Street
                            Wilmington, DE  19806
                            (302) 655-4200

For DBTCA:                  McCarter & English
                            BY: KATHARINE MAYER, ESQ.
                            BY: DAVID ADLER, ESQ.
                            405 N. King Street, 8th Fl.
                            Wilmington, DE  19801
                            (302) 984-6312

For Wilmington Trust:       Brown Rudnick
                            BY: MARTIN SIEGEL, ESQ.
                            185 Asylum Street
                            Hartford, CT  06103
                            (860)509-6519

For Great Banc:             Womble Carlyle
                            BY: THOMAS M. HORAN, ESQ.
                            222 Delaware Avenue, Ste. 1501
                            Wilmington, DE  19801
                            (302) 252-4339
For Cantigny/McCormick
Foundation:                 Katten Muchin Rosenman, LLP
                            BY: JOHN SIEGER, ESQ.
                            525 W. Monroe Street
                            Chicago, IL  60661-3693
                            (312) 902-5200

                            Duane Morris
                            BY: RICH RILEY, ESQ.
                            1100 N. Market St., Ste. 1200
                            Wilmington, DE  19801
                            (302) 657-4900
For Employee Compensation
Defendants Group:           Frank Gecker, LLP
                            BY: JOSEPH FRANK, ESQ.
                            325 N. LaSalle St. 625
                            Chicago, IL  60610
                            (312)276-1400
```

45

1  R. McCormick Foundation appearing pro hac vice, thank you
2  very much, Your Honor.
3         And just to be clear, although many creditors
4  file joinders to our objection, I'm here and speaking only
5  on behalf of the foundations. We don't object that had
6  there been no claim brought to avoid these transfers by the
7  estate, then the state law constructive law claims would
8  have flown back to the individual creditors. We think that
9  because -- I think the point that Your Honor just raised
10 albeit not in the manner I'd hoped you raise it, that these
11 very transfers are being sought to be avoided by these
12 estates and precludes individual creditors from seeking to
13 avoid them, even under a slightly different theory or even a
14 different theory. It's the same dollars, the same
15 transfers, you know, consider it a single satisfaction issue
16 if you have to. To the extent they go forward, they're
17 necessarily reducing the value of the claims the estate is
18 bringing because we cannot be made to pay them both.
19        So with that, I really did not mean to interrupt.
20 I only rose so that you know that there is an issue to that
21 extent.
22        THE COURT: So it's your position basically that
23 the estate would have first call on any proceeds?
24        MR. SIEGER: I think that's right, Your Honor. I
25 think the case law supports that.

46

1         THE COURT: Okay, thank you.
2         MR. GOLDEN: Your Honor, what I was going to say
3  that I'm not aware of any party disputing the specific
4  question you raised which is when a state representative
5  fails to bring a timely avoidance action is there any real
6  dispute that it reverts or individual creditors retain their
7  state law rights, I didn't hear counsel suggesting that he
8  is actually disputing that. He made the slightly subtle
9  argument that says when the estate is bringing another cause
10 of action, a similar cause of action, it should deprive the
11 individual state law creditors from having standing to
12 pursue their claim and they've cited some case law for that
13 effect or to that effect.
14        Your Honor, that doesn't go to the issue of
15 whether these claims exist and are they viable and are they
16 entitled to be brought by the individual state law
17 creditors. That's a standing issue which I'm going to get
18 to. The standing issue is certainly not an issue for this
19 Court to decide.
20        THE COURT: I don't disagree with that, but let's
21 -- as much as I don't like to do this sometimes, but I think
22 it may be appropriate here, let's look down the road a
23 little bit. The objection here is that well, look, we're
24 only going to be required to pay this one time. So the
25 question that that raises is how should this Court, if at

47

1  all, address the potential conflict between those two sets
2  of plaintiffs.
3         MR. GOLDEN: Okay. Two points I'd like to make
4  with respect to that, Your Honor.
5         Number one, again, under the heading of
6  bankruptcy indeed makes strange bedfellows, despite the fact
7  that there has been tremendous contentiousness over the two
8  competing plans, there is a similarity between the two
9  competing plans and that is the establishment of a
10 creditor's trust in order to house these individual state
11 law constructive fraudulent conveyance claims. The
12 architects of both of those claims, the debtors, the
13 creditors' committee, and the lenders on one hand, and the
14 noteholders on the other, have made an informed decision as
15 other bankruptcy plans have done to allow those claims to
16 run in parallel and to prosecute them in parallel.
17        What the foundations I'll suggest not
18 intentionally have suggested is because the creditors'
19 committee have, in fact, filed intentional, estate
20 intentional fraudulent conveyance claims against the
21 redeeming stockholders, that that should take precedence.
22 But one problem we have with that is and I think Your Honor
23 knows as having sat through two weeks of testimony is it is
24 the intention of DCL plan proponents to release the
25 intentional fraud claims asserted by the creditors'

48

1  committee against the Step 1 holders.
2         So what the foundations want is their cake and
3  eat it, too. They want to have the DCL plan go forward.
4  They want to have the claims, the intentional fraudulent
5  conveyance claims released against the Step 1 holders, but
6  they want to run out the clock so that the individual state
7  law constructive fraudulent conveyance creditors don't have
8  the ability by the state law statute of limitations which as
9  we say in our paper, could be as early as June 4, less than
10 two and a half months away. They won't have an effective
11 remedy at that --
12        THE COURT: Well, let's assume that's true. The
13 bridge lenders in their proposed form of order suggest that
14 what ought to happen is that you should be permitted to file
15 complaints, but not prosecute them until after the
16 confirmation process is complete. Is that something that
17 you've agreed with or inclined to agree with or disagree
18 with?
19        MR. GOLDEN: In fact, Your Honor, we said in our
20 opening brief, our opening motion, that it was the intention
21 of what we called the original plaintiff group, Aurelius,
22 the two senior indenture trustees, Wilmington Trust as
23 indenture trustee for the PHONES notes was to, in fact,
24 commence those lawsuits in order to toll the statute of
25 limitations and that we would voluntarily agree to stay

49

those actions pending the completion of the competing plan process.

We are not looking to create chaos here. What we are trying to do is to ensure that at the end of the day in a very uncertain plan process, that these state law constructive fraudulent conveyance claims will survive. Now they may be dealt with one way or another depending upon whether the DCL plan is confirmed, or the noteholder plan is confirmed, or a third version of a plan is confirmed. But most important is the filing of those complaints so that we can toll the statute of limitations. So unless Your Honor has any other questions, I'll just continue on, thank you.

As I said, we believe it is well settled that once the estate representatives fail to bring the action within two years, it reverts or the individual state law creditors would gain those rights. It's also we believe clear law that once an estate representative can no longer bring those claims, it has no right to settle those claims. As I said, neither the debtors or the creditors' committee opposes relief and is, in fact, as noted by Your Honor, the creditors' committee affirmatively supports the relief in order to be protective and to acquit their fiduciary, their perceived fiduciary obligations to the general unsecured creditors here.

THE COURT: It could be the nicest thing Aurelius

50

has ever said about you.

(Laughter)

UNIDENTIFIED SPEAKER: I made a note of it.

MR. GOLDEN: So I just want to make sure that the Court fully appreciates the intense time pressure we are working under. You know better than anybody in this courtroom where we stand on the competing plan process. It is not clear that we will have an answer by June 4. As we indicated in our pleadings, there are several likely jurisdictions in which the state law claims would be brought; Illinois, Delaware, Massachusetts. All of them have four year statute of limitations for claims such as these. That four year statute of limitation as it relates to Step 1 expires on June 4. And as I said, the most important thing for us to do is to get those things filed.

Your Honor, I want to turn just for a minute to the objections themselves and we've touched upon it a little bit. The McCormick Foundation and I'm going to mispronounce this, the Cantigny, but I'll just call them the foundation so I don't continue to muffle that name, have opposed the relief. And they have been joined in that opposition by seven or eight other recipients of the shareholder redemption payments. A group of three former directors and officers of the debtor, a group of seventeen current and former directors, officers, and employees, a fellow named

51

Crane Kenny who doesn't bother to identify himself, the ever present EGI- TRB and Sam Zell, Bank of America and Merrill Lynch, two of the four agents and arrangers for the disastrous LBO loans, Chandler Bigelow, the current Chief Financial Officer, and an untimely joinder filed by 200 so called TM retirees which includes William Niese, a member of the official creditors' committee. All of those parties have in common one thing. Maybe they have more than one thing, but one thing they certainly have in common, they have received shareholder redemption payments that they want to avoid having to disgorge back to either the estate or to the individual state law creditors.

It's worth nothing, I think that the foundations raise two principal arguments, one we've discussed already which is a standing argument. And they cite a number of cases that suggest when the estate is bringing a similar cause of action, that the -- it deprives the individual creditors from standing to bring a separate action. And we've addressed those cases in our reply and we actually think the case that's most factually analogous to the situation we have here is the *Baron Financial Corp, 501 F.Supp.2d, F01, District Court of Maryland.* There in that case, there was an agreement between the estate and a plaintiff seeking to bring similar causes of action that the estate had brought or was able to bring. That's very

52

analogous to the situation that we have here.

As I have just described to the Court, both the DCL plan and the noteholder plan contemplates this very arrangement. Having the individual state law fraudulent -- constructive fraudulent conveyance claims housed in a creditors' trust to be prosecuted on behalf of the individual creditors at the same time the intentional fraudulent conveyance claims are being pursued by the estate under either the DCL plan or the noteholder plan.

Since the foundations are so concerned about the issue of standing which as I'll get to a second, I think really has no place here. It is not for this Court to adjudicate the standing issue if and when these claims are actually brought to Trial Court under doctrines of ripeness will be the correct court in our view to determine the issue of standing. But since they've raised the issue of standing, I fail to understand what the standing is of the foundations who as far as I know are not creditors of these debtors. Are no longer shareholders of these debtors.

So I don't -- I'm not sure I understand how they have the right to be heard here in this court to complain about this rather procedural motion that Aurelius has filed along with the other noteholder proponents seeking very limited relief. A, that the filing of such lawsuits would not violate the automatic stay. And B, would not violate

53

1  Your Honor's mediation order.
2          Second point and I'll be brief, Your Honor.  The
3  foundations raise the 546(e) issue as to whether these type
4  -- whether that statute prohibits state law constructive
5  fraudulent conveyance claims.  They cite a lot of cases.
6  They don't cite a single case that stands for the
7  proposition when someone other than an estate representative
8  which is required under 546(e) to be applicable when someone
9  other than an estate representative brings an action, an
10 avoidance action to recover shareholder payments, there is
11 no bar as far as we know and --
12         THE COURT:  Well, the argument if I can put it in
13 my own words is that what you want is -- constitutes an end
14 run around 546(e) and that doesn't seem right to them.
15         MR. GOLDEN:  I understood the argument as well,
16 Your Honor.  That --
17 (Laughter)
18         MR. GOLDEN:  -- actually there is a case in the
19 District of Delaware.  I think it's *PHP Liquidating* that
20 does, in fact, address that issue and stands for the
21 proposition when it's not an estate representative bringing
22 that action, 546(e) loses its applicability.
23         So just to sum up, Your Honor, I think this is
24 rather mundane procedural relief we're seeking.  It's an --
25 I don't mean to minimize it, it's important to get these

54

1  lawsuits filed by June 4.  We don't believe that the
2  foundations have standing to oppose this relief.  And
3  frankly, even if you were to go through the issue of
4  standing which I think is a mistake as it would violative of
5  the Doctrine of Ripeness, the case law that they have
6  suggested, I don't believe supports their position.  Thank
7  you, Your Honor.
8          THE COURT:  Thank you.  Let me hear first from
9  those who are in support of the motion and then I'll hear
10 from those who are opposed.
11         MR. LEMAY:  Your Honor, excuse me, good morning.
12 David LeMay from Chadbourne & Parke for the official
13 committee of unsecured creditors.  As a preliminary matter,
14 I would not want Your Honor to become irrationally exuberant
15 about the fact that I rise in support of Aurelius' motion or
16 about the configuration of the courtroom this morning.  But
17 it is the case that we do support this motion and for the
18 reasons that Mr. Golden said which is that as a fiduciary
19 matter, it certainly seems that the motion that they've
20 filed is best calculated to maximize unsecured creditor
21 recoveries.
22         Mr. Golden has really very adequately and more
23 than adequately as he always does, summed up the argument.
24 And I think Your Honor is obviously very well seized of it.
25 The relief here is procedural and it is -- it's really very

55

1  limited in the ways that he described, relief from an order
2  entered by this Court and from the automatic stay.  The
3  bondholders have filed that because as Mr. Golden mentions,
4  there's a June 4 clock ticking.
5          I think Mr. Golden said that there is intense
6  time pressure.  I suppose I would observe that although June
7  4 is not an eternity away, it's not tomorrow either.  And
8  the time pressure is as I suppose not quite as intense as
9  when we dealt with some of the issues prior to the December
10 two year statute of limitations.  So there is I would say a
11 little bit more time, but here we are on the motion.
12         With respect to the objections, I think it's
13 pretty clear that the cases really do in the way that Your
14 Honor, I think prefigured, all fit together.  It's not like
15 there are two separate sets of cases that go in different
16 directions.  You've got the *Ruppert* case from the Fourth
17 Circuit and its progeny and that's the famous first swing
18 case.  The Fourth Circuit said that the purpose there was to
19 assure that when the estate and individual creditors might
20 otherwise be in effect scrumming for the same causes of
21 action, the estate gets first swing.  And here -- and so
22 what that imposes is the notion that while the estate
23 fiduciary is ready and able to pursue a claim, it does get
24 that first right.  But once those claims pass out of the
25 estate's hands and here they have for the reasons that Mr.

56

1  Golden summarized, that I think that first swing doctrine is
2  satisfied, the first swing has in effect been had.
3          And if you want to continue with a baseball
4  metaphor, I guess what that means is the estate
5  intentionally took the pitch.  At that point, I think the
6  *Baron* case is the one that tells you what happened.  And the
7  *Baron* case says that there once the estate's first swing has
8  been had or passed, it does revert to individual creditors.
9          I think it would be a fairly serious torturing of
10 *Ruppert* and would require a serious -- fairly serious
11 torturing of R*uppert* to suggest that the dicta in that case
12 about the objects and purposes of the two claims being the
13 same meaning that they must travel together.  I don't really
14 think that's what *Ruppert* was getting at.  *Ruppert* as I
15 mentioned was really about prioritizing of what happens when
16 the estate wants to assert the same claims.
17         Here, instead, what's being said by the
18 foundations and I think Your Honor expressed some skepticism
19 about it, quite correct skepticism is that I guess the
20 argument that's being made is that the assertion of
21 intentional fraudulent transfer claims in Federal Court in
22 effect precludes the creditors from pursuing constructive
23 fraudulent transfer claims in State Court.  And I just don't
24 think that can be the case.  And even if it were the case,
25 as we point out in our papers, the two claims really are not

57

the same. There are different pleading elements, different burdens of proof, different recoveries, and of course, most notably different defenses.

So even if that *Ruppert* doctrine or I'm sorry that *Ruppert* dicta about objects and purposes being closely correlated were to apply, these are different lawsuits about different things. And for those reasons, I don't think *Ruppert* would be decisive even if the objects and purposes test there were applicable which I don't think it is or I'm sorry, it's objects and intents is the actual terminology.

As to the 546(e) defense which, again, I don't -- I do agree with Mr. Golden is not properly before the Court today. Just a couple of things. It's really an attempt to pre-litigate a motion to dismiss. It's an attempt to get a first crack at a motion to dismiss and then presumably have a second crack in State Court later. That issue, I think as Mr. Golden says would need to be litigated in the Court where the litigation was brought. Everything Mr. Golden says and that we mentioned in our papers about the *PHP* case is true.

And the final thought I thought I would leave Your Honor with on -- that is it's very interesting when people -- people's metaphors sometimes say a fair amount of what they're really thinking. And the metaphor that's been used here is the metaphor of an end run, another sports

58

analogy. And an interesting thing about the end run is that although it can sometimes surprise people, it's a perfectly legal play. And I don't want to put too much weight on metaphor, but I think it does tell us something about this posture here.

The committee supports the relief set forth in the proposed order that was submitted by Aurelius. I believe that they will hand up to you, if it becomes appropriate, a revised form of that order reflecting certain comments we had and the committee would support the entry of that revised order. And I'm available to answer any questions that the Court has.

THE COURT: All right, thank you, Mr. LeMay. Anyone else in favor of?

MR. SIEGEL: Good morning, Your Honor. Martin Siegel from Brown Rudnick on behalf of Wilmington Trust.

Wilmington Trust, the indenture trustee for the PHONES has joined in the motion and we adopt the arguments of counsel for Aurelius and counsel for the creditors' committee, but there is a couple of things I do want to mention.

First of all, the claims in the trust at least in the first instance on behalf of the PHONES pursuant to Section 5.05 belong to the indenture trustee to bring. The indenture trustee here does intend to bring them. And

59

because of our place in the capital structure, the PHONES place in the capital structure, this is particularly important relief, Your Honor, and may well be a very important source of recovery for the PHONES.

In particular, I think the debtor actually agrees with us. With regard to the creditors' trust, one of our objections to the debtors' plan was that the creditors' trust that the -- that's part of that, we made the argument that those contractual subordination provisions do not apply to the creditors' trust for at least any PHONES holders that did not opt out. And the debtor agreed with us in Page 140 of their confirmation brief and said they're going to be amending their plan to reflect that. We think the same principle will apply to any -- the state law claims brought by Aurelius, the other indenture trustees, and Wilmington Trust.

So from our standpoint, Your Honor, in particular, we strongly urge that you grant the motion, thank you.

THE COURT: Thank you. I'll hear from objectors.

MR. SIEGER: Good morning, again, Your Honor. John Sieger for the foundations appearing pro hac vice.

Your Honor, I want to pick up first on a point that the committee raised in terms of the timing of this and it actually goes --

60

THE COURT: Well let's -- why don't we talk about your standing first?

MR. SIEGER: A couple of points on that, Judge.

THE COURT: And typically, an entity that's not a creditor of the estate or not otherwise a shareholder or other party and interest wouldn't have standing to complain about being a defendant in an adversary or a potential defendant in the lawsuit. And why would that be different here?

MR. SIEGER: Well, I've got at least three responses to that, Judge, and maybe a fourth.

The first being, I'm not aware that anybody ever raised the standing issue ahead of now and I would suggest that it's been waived. But to the extent that standing is always an issue in front of the Court, we did argue in connection with our confirmation objection that we are a party and interest, albeit not a creditor. There's no dispute. We are not a creditor of this estate. We do believe that we need to test -- it's fully briefed there. Because it was not raised in the papers today, I'm not ready to cite the cases we cited there, but I think -- I don't believe anybody challenged it when we filed the confirmation objection, frankly.

Next, Your Honor, I would submit that --

THE COURT: The parties have been focused on

61

other things I think.

    MR. SIEGER: I heard there was something going on in this room.

(Laughter)

    MR. SIEGER: Your Honor, in addition to that, I would suggest that there's half a dozen lawyers in this room that represent creditors that joined the motion. I think the issue is before the Court whether or not it is I personally that was speaking to you. The issue is properly before the Court on behalf of creditors.

    THE COURT: Yeah, I didn't think I was going to avoid a decision based on that.

(Laughter)

    MR. SIEGER: Your Honor, I'm happy to go further with that, but in the event that Your Honor wanted to enter an order today that said that we have no standing here today and that nothing that's happening in this order is going to impact us in any way in the impending State Court cases, I think I'm stuck, I would sit down. I wouldn't be happy about that, but I would have to sit down.

    They're going further, Judge. They're asking you to make a couple of findings that I believe, although they say in their motion that it's a routine motion and that everything is preserved. They're asking you to find number one, that these claims are not property of the estate. And

62

they're asking you, number two, to say that these claims are reverted to them. I have seen a couple of versions of the order, not the one that was just referenced by committee counsel. But so far as I know, that language is survived in all of the drafts of the order.

    I think if one were to be intellectually consistent with the statements that this is just a routine precautionary sort of motion, what Your Honor is really being asked to enter is sort of an agreed stay relief motion. That in the event these state law claims are brought, the creditors' committee, the debtor, maybe the U.S. Trustee is not going to allege that they violated the automatic stay.

    THE COURT: Yeah, if it applies.

    MR. SIEGER: That's correct. If, in fact, Judge, that was the limit of the relief sought here today, I'd have a lot less to argue about.

    THE COURT: What about the provision in the mediation order from which relief is sought?

    MR. SIEGER: I don't have a position on that, Judge. If they need -- I'm not familiar with it, but if they need a relief from that in order to do it, that's not my concern. But as to the timing issue, Your Honor, I -- can -- are you happy with that issue?

    THE COURT: You don't have to sit down.

63

(Laughter)

    MR. SIEGER: On the issue that the committee raised in terms of the timing, there is a lot of overlap here between the issue that we raised in our objection and the issues that we and other creditor -- that we, a non-creditor and other creditors raised in connection with confirmation. And I agree with the committee's sort of implication that this may not be a today issue. We're not trying to -- we don't expect to run out the clock, Judge. I mean, we're talking about as to my clients $1.2 billion. We're not expecting the army of lawyers that represent the estate or the largest creditors to somehow let that slip through the cracks or for Your Honor to allow that to happen. But I would suggest that what happens at confirmation could impact us.

    There's an allegation that was raised today that, you know, we're going to get a release as to Step 1. And while aware that that is proposed in one of the plans, I, unfortunately, have not heard Your Honor sign off on that. So I think it is premature to base any argument on that. I would -- and only Your Honor knows what the timing is of the confirmation hearing, but I would suggest that if there was a ruling even in late May, they could pick up and file whatever claims they need to file in order to make a June 4 deadline. I really would only ask that this matter be

64

pushed over until the argument on the confirmation objections which covers not only this issue, but some related issues.

    But to the extent Your Honor wants to go forward today on this issue, I do have legal argument to address what the Aurelius counsel suggested.

    THE COURT: Then proceed.

    MR. SIEGER: Okay. Your Honor, it is accurate to say that we raised two main objections. And I know you've read the paper so I'll just highlight them briefly. Number one is the standing issue. And number two is sort of the preemption 546(e) issue.

    Your Honor, what we have not heard from anybody here despite the fact that this is being presented to you as a routine motion, nothing out of the ordinary is a single citation to any case where any creditor outside of Bankruptcy Court, sued to avoid the very same transfers that the estate has sued to avid. The fact that they're calling them constructive fraud claims as opposed to actual fraud claims, we are talking about the same as to my client's $1.2 billion.

    We have cited a case law that suggests that if it's in the same ballpark roughly, they're precluded from doing that. And I don't know, there really is no effort to overcome that. They suggest that the cases are different,

65

but not based on relevant points. Nobody says here's a case where this has happened and where it's appropriate. So at an absolute minimum, this is unusual relief. I might suggest this is an issue of first impression before Your Honor. It's certainly not a routine motion.

Again, Your Honor, in terms of the ripeness, if, in fact, they were not asking you to make findings that number one these claims were property -- were not property of the estate, and number two, that they've somehow reverted to the creditors, I -- the ripeness argument would have more appeal to me. But what they want is an order to go waive in front of a State Court Judge essentially with your imprimatur on it suggesting you have a claim, Mr. Creditor.

THE COURT: I know that.

MR. SIEGER: Okay.

(Laughter)

MR. SIEGER: I'll move on. Your Honor, I would go further to say that even if there was some question even following that comment about ripeness, you have a lot of discretion here. And the mere fact that they are seeking to file claims to recover the same dollars that the estate is puts it squarely before Your Honor. You're the Bankruptcy Judge for this estate and they're essentially talking about depleting the value of the estate claims that have already been raised.

66

I would submit that if the creditors' committee, the debtor, and Aurelius were really all arm in arm about this, the easy fix would be for the committee complaint to dismiss the actual fraudulent transfer claims against the foundation. That way, they're not both going after the same dollars. If, in fact, they're right, it's a lower standard of proof for them. I mean, that -- the reason that there's no case law on this, Your Honor, as part of your original opening remarks, I believe is that it makes no sense to allow somebody to go run off in the State Court and to try to challenge the very same transfers, the very same dollars that are supposedly going to be administered through a bankruptcy plan for the benefit of all of the creditors.

Judge, I hear that one of the ideas is that, you know, maybe we punt this issue down the road and they go file a bunch of lawsuits of various jurisdiction and then everything gets stayed. In many ways, that's the worst of all situations to the foundations, Judge. We are a charitable foundation, but the lion's share, I don't know the exact numbers, but certainly the bulk of the foundation's assets are put at issue by the filing of these complaints.

And again, while we do believe in the single satisfaction, we have -- we would have a very different view just based on the legal standards of our exposure to an

67

actual fraudulent transfer claim than we would to four or five different constructive fraudulent transfer claims where not only is the standard different, but you've got four, five, six judges looking at it differently.

In a way, we would be sort of frozen as a foundation. Our charitable works could be frozen in time because all of our assets now are potentially at play. I don't think it would be good results here from that perspective if you just want to look at it on an equitable basis, to force the foundation to essentially freeze it's good works at least at this, what I believe is a premature point in time prior to the confirmation issues being resolved.

Now Judge, sort of the next point they raise is they spent a lot of time trying to distinguish our case law, but the point that they distinguish almost every case on is this notion that in the cases we cite, there was only a potential estate cause of action having to do with the same issues that the creditors were going after. And they say that none exist here because the two year statute ran and, therefore, they reverted back. They sort of have already presumed the reverting back issue. It belies -- it ignores our point which is that they have not reverted back principally because the estate has brought these claims. So they think that that fact is affecting their favor. I think

68

that fact is affecting my favor because it's not even a potential claim, it's an actual claim that's already been brought to avoid these dollars. So at a minimum, that is not a point of distinguishment in the favor of the movants in my view.

Your Honor, the next big point they raise is the *Baron* case and I suggest that if Your Honor, your clerk reads that case closely, you're not going to find that it's particularly helpful to the movants' position. First of all, again, it doesn't avoid these -- sort of this idea of competing suits to avoid the same transfers which in our view is the issue that's in front of Your Honor.

And secondly, that Court, the *Baron* Court held that plaintiffs' claims were direct sort of unique individual claims, never common general claims which obviously we're talking about here fraudulent transfer claims.

And finally, those parties, Judge, at least as written up in the case, the estate parties and the creditor parties worked together to make sure that there wasn't overlap between the claims. There's obviously overlap here.

THE COURT: Well, the movants says both plans are designed to address that issue.

MR. SIEGER: That may be, Judge, but we've objected to both plans on exactly this ground. This was

69

1  part of the reason why I think this should be heard at a
2  later time.  I think it's great that they're all holding
3  hands and say this is a wonderful thing, but that doesn't
4  address any of our objections which have not been ruled on
5  so far as I know and --
6          THE COURT:  Not so far as I know either.
7          MR. SIEGER:  Okay.  Well you would know, Judge.
8  (Laughter)
9          MR. SIEGER:  But getting back to the *Baron* case.
10 There's I think a helpful quote in there that distinguishes
11 exactly how different that case is from this case and that's
12 at *509F.Supp 520* where the Court says "plaintiff is not
13 trying to recover assets diverted from the debtor."  That is
14 exactly what is happening here.  The plaintiff creditors,
15 the state law creditors are trying to recapture stock
16 redemption payments made by the estates or the pre-
17 bankruptcy companies to us.  So in my view, *Baron* is not
18 helpful.
19         Your Honor, they raised the same ripeness issues
20 to 546 for the reasons I've already argued on in my first
21 point.  I think the same apply there.  As to the merits, I
22 do have to agree that the *PHP* case has facial appeal and may
23 even have more than facial appeal.  It's the one case they
24 cite, frankly, that gives me pause.  But again, I suggest
25 that if Your Honor reads that closely, the ruling itself is

70

1  at odds with the *Hechinger* case and the other cases which
2  suggest that plain language is not the end of the analysis.
3          If, in fact, the plan language is at the end of
4  the analysis which this Court holds, the end arounds as
5  we've been referring to them that other Courts have found
6  inappropriate, would not be precluded by the language in the
7  statute.  I mean, it's the same sort of concept.  I might go
8  so far as to say that that view is dicta, the holding at *PHP*
9  because the Court went on to find that the creditors had no
10 standing in that case to bring the claims.  But I'm not
11 going to overstate that position, Judge.  That case is the
12 one case that stands for one of the propositions they are
13 suggesting.  We believe it's distinguishable for the reasons
14 I've just said, but I'm going to give credit where credit is
15 due.
16         With that exception, Judge, with the exception of
17 that case which only addresses one piece of this, we haven't
18 seen any evidence.  Any -- I'm sorry, any case law or
19 authority to support their position.  Nobody's disputing the
20 fact that had the estate not brought these claims, the state
21 law fraudulent conveyance claims would have reverted back,
22 but that is not the issue here.  We spent a lot of time
23 talking about that.  Nobody cares about that.  There is no
24 support for the idea that a creditor can independently
25 challenge in State Court the very same transfers, even under

71

1  a different theory, the very same dollar transfers that the
2  estate has.
3          THE COURT:  And what if I were to enter an order
4  that didn't dispose of that issue?
5          MR. SIEGER:  I don't know how to respond to that,
6  Judge.  You're -- I would lump it for lack of a better word.
7  You're the Judge.  I guess it would depend on what sort of
8  order you were intending to craft.
9          THE COURT:  Well, I'll probably give the parties
10 a first crack at it.
11 (Laughter)
12         MR. SIEGER:  But I would suggest that to the
13 extent you're inclined to grant this motion on some level, I
14 would suggest number one, that it should only be applicable
15 as to the movants, not to creditors as a whole.  And by the
16 way, in response to one of the issues in the reply, I did
17 not -- we did not mean when we made that comment to suggest
18 that to the extent any of the movants is a trustee for other
19 creditors, that they're prohibited from bringing that claim.
20 That's not the point.  We just don't think it's appropriate
21 for a bunch of creditors unrelated to these movants to be
22 able to bring claims on a motion that they did not bring or
23 support.
24         Number two, we don't think there should be any
25 finding at all, Judge about these claims reverting or them

72

1  not being property of the estate.  What we're talking about
2  here should be a simple you can go file these claims and
3  nobody's going to accuse you.  Or this Court is not going to
4  hold you as having violated the stay for doing so.  To me,
5  that is the absolute end of the analysis.  If, in fact, this
6  really is a simple procedural motion, there doesn't need to
7  be anymore tricks in language and stuff that they can waive
8  in front of a State Court Judge.  We should have a fair shot
9  to raise all of these defenses.
10         And I would actually ask that, Your Honor, if you
11 are going to grant this motion, would include a specific
12 finding, expressed finding or an expressed ruling that the
13 issues that we've raised in our objection, including 546
14 standing and preemption are all preserved for each of the
15 State Courts to weigh in on.  I have a concern that any
16 order from this Court is going to viewed by a State Court
17 Judge in the absence of some expressed language to the
18 contrary, as you somehow having passed on the validity of
19 these claims or the standing issue.  If, in fact, they're
20 not asking you to do that, we should make it very clear in
21 the order.  Thank you, Judge.
22         THE COURT:  Thank you.  Does anyone else wish to
23 be heard?
24         MR. BRADFORD:  Yes, Your Honor.  David Bradford
25 on behalf of EGI-TRB.

73

Your Honor, I'd like to address both the scope of the motion as it relates EGI-TRB, as well, as the merits of the motion. This motion sought relief with respect to the recovery of what I referred to as shareholder redemption payments. EGI-TRB, unlike anyone else before the Court on this motion, received no cash. It received no payments. And it did not believe it was within the scope of this motion as the motion was filed. There was a footnote dropped in the reply brief that was submitted by the creditors' committee indicating that while Mr. Zell was not a defendant in this case because, in fact, he received no cash and there's no dispute about that, that EGI-TRB was mistaken in its believe that it was outside the scope of this motion and that it was deemed to be a Step 2 selling shareholder.

The basis for that contention illustrates the problem with the merits of this motion. And that is -- and this part of the transaction I think is undisputed, EGI-TRB as part of Step 1 was obligated to purchase $50 million or Tribune stock. It was obligated to redeem that stock as part of Step 2, but in the form of a credit towards the purchase of its Step 2 note.

So EGI-TRB never got back its $50 million. What it got was a credit toward a larger investment that it was obligated to make in Step 2. And what it then received in

74

consideration for that stock was part of the funding of a note which is part of a claim before this Court. There is an effort in the pending complaint to avoid that note. To now permit State Court litigation which would seek to avoid the very note that is the subject of avoidance efforts before this Court, illustrates precisely why no Court has previously permitted the pursuit of State Court litigation to essentially avoid the very transaction that is the subject of avoidance complaints still pending before the Bankruptcy Court.

We think the resolution of our predicament is easier than the larger questions raised by this motion and that Your Honor should make clear that whatever claims are permitted here, they should not include efforts to avoid the EGI-TRB second step note as long as claims are still pending with respect to the avoidance of that note before this Court. And in particular, I would note that the issues of timing are not compelling as they relate to our circumstance because the only contention as it pertains to EGI-TRB or relates Step 2. So any limitation issue would not become a concern until December. There is no Step 1 issue here that would compel an immediate filing of any kind of complaint.

We also note, that unlike the suggestion that there may be a release of competing Step 1 claims, there is no suggestion that the Step 2 claims that would compete for

75

the same recovery are going to be released. So we are clearly going to be in a situation where the very same note is the subject of avoidance actions not only before this Court in connection with the consignments complaint, but potentially before four or five other State Courts. And that again, is foreign territory where no Bankruptcy Court has permitted creditors to go. And it would be particularly unreasonable and unfair in this context as it pertains to the suggestion that this issue be deferred.

We do have confirmation objections to this very aspect of the plans. We have objections that relate to the 546(e) issue. There's no reason for this Court to prejudge those objections by deciding this issue now as it pertains again solely to EGI-TRB because again, the issue only becomes a problem for the creditors if ever as the December date approaches. And hopefully, we'll be in a position of resolving these issues in the context of confirmation prior to the time that we get to a limitation issue as to the Step 2 obligations.

So for that reason, we would ask the Court that however you resolve the larger motion, that you make clear that the unique circumstances raised by the double recovery efforts against the EGI-TRB note and the $50 million of stock that was credited toward the purchase of that note, again not involving any cash, are not the subject of that

76

lifting of the stay or of that authorization.

I'm happy to answer any questions that the Court may have.

THE COURT: Well, I'll hear what the movants have to say at the end in response to your particular objection, but I guess the only initial thought that occurs to me is what if, in connection with the trial and disposition of a constructive fraudulent conveyance claim in a State Court, a State Court decides that the transaction should be collapsed? Does that have any implication on your argument that nobody has to worry about an expiring statute until December, with respect to your claim?

MR. BRADFORD: No, Your Honor, because there was no consideration paid to EGI-TRB in connection with step one. So in other words, all of the claims against a step-one shareholder is -- are shareholders who received cash in exchange for their Tribune stock in connection with step one. EGI-TRB did nothing but put money into Tribune in connection with step one. So to review the history, at step one, EGI-TRB pays Tribune $200 million for a note; it pays Tribune $50 million for stock. That's the end of it. It gets nothing back. So if step one is avoided, there is nothing to recover from EGI-TRB as it pertains to step one. The only issue is whether EGI-TRB is entitled to some recovery on account of the obligations owed to it by Tribune

77

1  as it pertains to those transactions.
2           At step two, EGI-TRB is obligated to put in
3  approximately an incremental $90 million to its investment,
4  and that new investment takes the form of a $225 million
5  note and a $90 million warrant.  Rather than put entirely an
6  additional $315 million of additional cash in, the prior
7  investment of 225 is credited toward the increased
8  investment.  So again, no cash comes back.  But all of that
9  happens in December.  So to the extent that somebody could
10 argue constructively that somehow this credit toward a
11 larger investment is somehow avoidable, that does not occur
12 until December.  And whether the transactions are collapsed
13 or not, there would be no claims pertaining to transactions
14 occurring in April or June, because again, EGI-TRB did not
15 receive anything of value in connection with the first step
16 of this transaction.  It only lost money insofar as the
17 first step of the transaction goes.
18          I would also just note, on the issue of standing,
19 that EGI-TRB contends that it has prior over any
20 distribution to the PHONES as a matter of subordination and
21 priority and therefore does have an interest in the
22 disposition of the estate proceeds in its capacity as a
23 claimant against the estate.
24          THE COURT:  Thank you.
25          MR. BRADFORD:  Thank you, Your Honor.

78

1           THE COURT:  Does anyone else wish to be heard?
2           MR. DOUGHERTY:  Good morning, Your Honor.  My
3  name's George Dougherty.  I'm here on behalf of certain
4  defendants.  We filed a joinder in the objection, and I just
5  want to make sure that we're here and we agree with what Mr.
6  Seiger [ph] said, especially the part about the UCC and the
7  state dismissing the intentional fraudulent conveyance
8  claims.  We'd love to have that happen.  I don't think it
9  will.
10          THE COURT:  Mr. Dougherty, who do you represent?
11          MR. DOUGHERTY:  We represent certain defendants:
12 Mr. Fitzsimmons [ph], Mr. Vanesco [ph], et cetera.
13          The other thing is, I do want to make clear that
14 the first two paragraphs in the proposal -- or that WESAU
15 [ph] yesterday, are inconsistent with the idea that they
16 just want to get these claims on file and that the new Court
17 should decide issues of standing.  Paragraphs one and two,
18 in particular, say that the claims no longer constitute
19 property of the estate.  And paragraph one says that the
20 creditors have regained their right to bring these claims.
21 We would object to those.  If there's a new order floating
22 around, I'd like to see it, to the extent you're
23 contemplating entering such an order.  Thank you.
24          THE COURT:  Thank you.
25          MR. TEITELBAUM:  Good morning, Your Honor.  Jay

79

1  Teitelbaum with Teitelbaum and Baskin for the TM retirees.
2  We filed a joinder to the objection, Your Honor.
3           Your Honor, while this has been characterized as
4  mundane, there are implications and ripples that affect not
5  only what is -- has happened in the case but what may happen
6  in the case.
7           We are in a somewhat unique position in that,
8  back in April, as Your Honor may recall, the TM retirees
9  entered into a settlement agreement.  That settlement
10 agreement was appended to the plan, the original plan, and
11 now the amended plan.  And essentially, what that settlement
12 agreement did was compromised and settled not only the
13 amount of the claims but set forth the methodology for
14 calculating.  And as part of that settlement, it provided
15 for releases in connection with LBO litigation.  The fact of
16 the matter is, Your Honor, the -- at that time, these
17 constructive fraud claims, and even at the time of the
18 amended plan, were property of the estate.  And it was, I
19 believe, within the contemplation of the parties that the
20 consequences of the -- of what we're here today, were not
21 even considered.
22          You know, I actually have the opportunity, now
23 that my daughter's taking business law in college, to go
24 over contracts 101.  There was no meeting of the minds at
25 this point, because no one really thought it through.  No

80

1  one realized what could happen in the context of what
2  happens if these claims get brought, talking not so much
3  double-recovery, because that's just not within the cards,
4  and I think we know that, but what are the implications to
5  the people who are being affected, and particularly my
6  clients and other similarly situated retirees?  We represent
7  about 200 of the 450.
8           The concept here was taking up to a 65-cent
9  haircut for peace in the valley, if you will.  And now, we
10 have to go back -- and they voted on a plan in that context.
11 If they are now being told: Guess what; you may be compelled
12 to defend -- putting aside merits, et cetera -- serious
13 litigation that could claw back up to 50 percent of that
14 which you may be given in the plan, that's not the deal they
15 bargained for.  That's not the deal they voted for.  And
16 what I'm up here to suggest that the unintended, or perhaps
17 the intended, consequences of this motion is to throw this
18 process into a bit more chaos than this Court has seen to
19 date.
20          THE COURT:  And who would've thought that were
21 possible?
22 (Laughter)
23          MR. TEITELBAUM:  Yes.  The fact of the matter is
24 that the exigency of that chaos outweighs the exigency of
25 June 4.  And what I would ask the Court is to give parties

81

1  who hadn't beforehand thought about what the implications
2  may be to people who voted on a plan and may now have to be
3  forced to come back to this Court and ask the Court: Wait a
4  second; we need to rethink this.
5      I'm not suggesting I have a better mousetrap or a
6  way to fix it, but I think we need time to see if we can
7  build that mousetrap, come up with a resolution that works
8  for everyone, whether it's reasonability, rational
9  thresholds for pursuing claims, whether it's just carving
10 out certain parties.  But the fact of the matter is, Your
11 Honor, there are implications here.  The PHONES stood up and
12 raised the issue of the subordination.  That's directly
13 implicated in connection with the plan.  That's an issue
14 here that would have to be fought on multiple fronts if, as,
15 and when these State Court actions were to proceed.
16     And speaking only for my clients, some of whom,
17 arguably, are more sympathetic than others in their relative
18 wealth, this is a tremendous burden for individuals.  And
19 you know, now, as a practitioner in a small firm as opposed
20 to a big firm, I see that implication to people, and I see
21 -- and I hear it on the other end when a trustee or a trust
22 says, well, you know, settle it if you don't want to incur
23 the litigation costs.  Well, that's real money to real
24 people who are -- have long since retired in this case from
25 this company, after giving 20/30-plus years and are now not

82

1  only faced with not having received pension benefits since
2  the filing of the case, and looking at 65 percent of their
3  retirement savings gone, faced with litigating the issue of
4  do I have to give back -- even if it's a million dollars and
5  you were 60 years old and that was your retirement.  How
6  would we deal with that, as individuals in today's world, or
7  in any world?  That's the reality of what this is.  This
8  isn't some law school exam; this is reality for people.  And
9  all I'm asking this Court for is the opportunity to sit down
10 with, hopefully, rational people and come up with a way to
11 say, you know, maybe individuals aren't the same as a
12 billion-dollar trust or other entities.  Maybe they are the
13 same, but we need to discuss it, because I don't think
14 people thought this through.
15     And so, Your Honor, I'm here to ask that the
16 Court not issue this ruling expeditiously in order to give
17 the parties an opportunity, as you have in the past, to try
18 to work through their differences.  And we've achieved
19 differing degrees -- varying degrees of success in that
20 effort, but there has been some success.  Thank you, Your
21 Honor.
22     THE COURT:  Thank you.  Excuse me.
23     MR. JACOBS:  Good morning, Your Honor.  I think
24 there's going to be two brief replies to some of the points
25 that have been made.  David Rosner, Kasowitz, Benson, Torres

83

1  & Friedman on behalf of Law Debenture Company of New York.
2  We're the indenture trustee for approximately 18 percent of
3  the senior notes, which is roughly $200/$240 million in
4  senior notes.  We're a co-movant under this motion, and
5  we're also a co-plan proponent, as your Court has -- as Your
6  Honor is probably aware.
7      I'm just going to respond to a couple of the
8  points.  Again, I think it is -- it's crystal clear that
9  nobody disputes who owns these claims at this point, and
10 nobody disputes -- well, nobody disputes that the claims of
11 constructive fraudulent conveyance is a different claim from
12 a fraudulent -- from an intentional fraudulent conveyance.
13 There is a dispute as to whether the overlap has some
14 bearing on whether Your Honor is going to allow these claims
15 to go forward or whether a statute of limitations -- an
16 actual defense -- is going to be created here today.
17     The foundations raise this issue of the ordering
18 of the prosecution before Your Honor as if that's an issue
19 that the Court need be concerned about between the estate
20 and between the creditors bringing state law claims.  I will
21 tell Your Honor that is certainly not an issue for today as
22 to how claims are prosecuted and the order in which they are
23 prosecuted.  Number one, that's a defense.  That would be a
24 defense, in any action.  That's a motion that any -- that
25 either Court would consider, based upon proceedings in

84

1  another Court, should that Court decide to stay in action,
2  should that Court decide to dismiss an action without
3  prejudice pending a determination of another Court.  And
4  I've seen those types of motions and litigated those types
5  of motions.  But again, that's a defense.  And the motion
6  said -- says it in a number of ways, and the movants have
7  said it in a number of ways, that the point is not to
8  prejudice any defense.  And so, to the extent that a
9  defendant wants to say, well, we'd like to see what happens
10 in this Court before this Court, then at least the Court
11 that has proper jurisdiction over the case would be the
12 Court that would be making that determination as to whether
13 ordering had anything to do.
14     But nevertheless, again, we do not seek to
15 prosecute these claims today.  We only seek not to hand an
16 actual $8.2 billion state-statute-of-limitations defense to
17 the defendants, which is why they're here today, because
18 they would like that defense.
19     This issue that there is a transaction that is at
20 issue in competing cases, let's say competing causes of
21 action in competing cases, that issue arises in almost every
22 single case in which there are estate trusts and creditor
23 trusts in which either the creditors have decided to convey
24 their claims to a trust, as what is proposed, or as to
25 whether creditors bring their own claims.  But the idea that

85

there is a similar transaction being attacked, it's happening in Lyondell right now, even as we speak, involving shareholder claims. It's happened in Revco in ten different courts. It's happening in Le Nature's, a case that I'm -- that's a case that I'm prosecuting where we've got individual creditors prosecuting their claims. We're prosecuting the estate causes of action based upon the very same transactions, the very same Ponzi scheme in that case. There's no difference than a direct and a derivative situation. This happens hundreds, if not thousands, of times. The transaction at issue, different claims, different plaintiffs, different forms of relief. So I don't really think that's an issue.

And it's certainly fine to hear, from a defendant standpoint, that there's no rush and let's not hear this today and why put the plaintiffs in a position where they can actually preserve their statute of limitations. We're one of the parties that may ultimately be bringing that, you know, assuming correct direction and indemnity, that we will be bringing that cause of action, we do not think it's appropriate for plaintiffs who have a cause of action to be given a hurdle and to stress a looming $8.2 billion loss, simply due to the passage of time. A lot can happen. Your Honor's comments were taken into account at the conclusion of the trial by the other day by a lot of people. A lot can

86

take place between now and when the Court ultimately determines or is called upon to ultimately determine. But nobody should be sitting and staring at a clock this far into a statute of limitations when the risk is a loss of $8.2 billion worth of claims. There's no basis for it. And by the way, if it turns out that any objections upheld, and if it turns out that a defendant, who's sitting here today, there is no claim against them anymore, that, too, is a defense that could be brought. First of all, they most likely wouldn't be sued; they would be dropped from the complaint. But let's say that that didn't even happen, because there was some dispute as to whether they would be released. The release would be put at issue in the proper Court, and that Court would determine the release as a defense.

The idea that these claims are reverting to the creditors is a nice terminology that people use, but I think, as we all know, and I don't think anybody would dispute, the claims don't revert to creditors. They never left the creditors. The claims were never divested of creditors, and they were never transferred to the estate. All that happened was that, for two years, they couldn't bring the claims. Now, two years later, they can bring the claims, because the estate no longer has any interest in it; the estate's business with these claims is done. There's no

87

basis to hold back the plaintiffs from bringing them.

The retirees, at the very end -- this is the last point I'll make, and I'll hand this over to the committee. That -- I didn't understand, really, the retirees' argument, other than to say that they did not want to get sued. And I know nobody ever wants to get sued, but there can be no point of there's a surprise here that the plans provide for shareholder litigation to go forward and anybody that received a payment, pursuant to the LBO, is a potential, if not an actual, defendant and will be sued. That's always existed in these plans. It's always existed in both plans. It's always been before the Court, and it was certainly out there when people voted.

So, Mr. Teitelbaum said that they didn't really think about it that way, and that's not a concern for the Court or for the plaintiffs as to how they decided to think about it. If it's a voting issue, they could change their vote, but under no circumstances can they carve themselves out as potential defendants if they actually end up getting sued on the basis of the shareholder claims that are being preserved. Thank you, Your Honor.

THE COURT: Thank you.

MR. SOTTILE: Your Honor, James Sottile of Zuckerman Spaeder, special counsel to the official committee of unsecured creditors.

88

I rise, rather than Mr. LeMay solely to address a factual point relating to EGI-TRB's arguments that it should be treated different from all of the other shareholders and that claims, if the Court grants relief in order to assert state law -- constructive fraudulent conveyance claims, it should not grant that relief as to EGI-TRB.

Your Honor, quite simply, there's no basis for treating EGI-TRB any differently from any other shareholder that received value in return for its shares. While you heard a very complex set of transactions described to you by Mr. Bradford, the bottom line is this: EGI-TRB had $50 million worth of stock. That stock was redeemed at step two of the transaction. It's true it wasn't redeemed in cash, but that's not a requisite for a constructive fraudulent conveyance claim. Instead of getting cash, as Mr. Bradford said, EGI-TRB got a $50 million credit against its obligation to purchase a note. If it hadn't gotten that credit, if the shares hadn't been redeemed, it would've had to pay $50 million in cash. There's simply no basis for treating a $50 million credit against an obligation to buy a note any different from getting $50 million in cash. And the fore, Your Honor, we submit that if the Court grants the relief requested, which the committee supports and believes you should grant, there's no basis for treating EGI-TRB any differently from any other party.

89

                Now, you also heard an argument from Mr. Bradford
that perhaps the timing supported a different result from --
with respect to EGI-TRB, that because their shares were
redeemed at step two, there's no great rush, and you could
hold off.
                Your Honor, I believe that Mr. Bradford's
analysis of the limitations issue is correct: that the
limitations, with respect to that redemption, properly
construed, wouldn't run before December.  However, you did
hear a very complex set of transactions described to you,
described as integrated, starting at step one, continuing
through step two, with respect to redemption of shares.  And
I don't believe that parties pursing these claims should
face the risk that someone later on will argue that all of
these transactions should somehow be collapsed together and
really the limitations period expired when the initial set
of transactions that EGI-TRB engaged in were set in motion.
So Your Honor, for that reason as well, we don't believe
there's any basis for treating EGI-TRB any differently from
any other shareholder, whose shares were redeemed for value,
as was clearly the case for EGI-TRB.  Thank you, Your Honor.
                THE COURT:  Thank you.
                UNKNOWN:  Your Honor, with -- oh, I'm sorry.
                MR. GOLDEN:  Your Honor, we did circulate, last
night, and we thought we had gotten it to everybody who had

90

filed an objection or a joinder, a blackline form of a
revised order.  If you -- Your Honor, I'd like to hand that
up for one minute.
                THE COURT:  If you would.
                MR. GOLDEN:  And if anybody in the courtroom
needs one, Mr. Dublin can give it to you.
                THE COURT:  Thank you.
                MR. GOLDEN:  Your Honor, I'd just like to point
out a couple of points.  I'm going to be very brief.  You've
heard foundation's counsel suggest that paragraphs two and
three of the proposed form of order are not appropriate.
Paragraph two says:
"Pursuant to Bankruptcy Code Section 546(a), creditors have
regained the right to prosecute their respective creditors
SLCFC claims against step-one shareholders and step-two
shareholders."
                I think that Mr. Rosner's explanation of the case
law is exactly on point.  Those claims never went away from
the creditors.  They've never been ceded to the estate.
They were held in abeyance during the pendency of the two
years -- first two years of the bankruptcy case, and once
that two years had expired and no cause of action had been
brought, the creditors were -- retained the right to
prosecute the claims.  I don't think anybody actually
disputes that.  That doesn't necessarily go to the point

91

that the foundations made, that because of a parallel
pending intentional fraudulent conveyance action, those
claims should -- the state law claims should not proceed.
That's a point that he's going to -- if we get an order,
he'll be able to argue to the trial court.  So I don't think
there's anything about the words in paragraph two that are
going to prejudice the foundation.
                So too, in paragraph three, the right to
prosecute a creditors SLCFC claim no longer constitutes
property of the debtor's estate.  I don't think anybody
actually disputes that.  And --
                THE COURT:  I might.  And I'll tell you why.
                MR. GOLDEN:  Okay.
                THE COURT:  There's a 3rd Circuit case out there
that arose in the 363 context, and I think the specific
dispute, and I forget the name of the case, centered around
whether these rights were transferred as part of a 363 sale.
The Court found they're not property of the estate, at least
for that purpose.  They're rights that can be asserted by
the estate, but I don't -- I think what the Court was
saying, they're not 541 rights.  Now, the effect may be the
same, but I -- and I'll give you some thoughts when we're
done, but --
                MR. GOLDEN:  Okay.
                THE COURT:  -- I have that concern.

92

                MR. GOLDEN:  Okay.  And Your Honor, the only
other point I want to point out, which I think should
relieve some of the concerns by the foundations counsel, is
paragraph eight, where we say nothing in this order shall
prejudice or impair any claims or defenses of any defendant
in any proceeding in respect of a creditors SLCFC claim.  We
were not trying, by virtue of this order, to get a leg up at
the trial Court.  They are going to -- the foundations and
any other defendant is going to defendant is going to have
every right to assert whatever defenses they have at the
trial Court level, and it -- and there will be nothing about
this order that's going to stop them from doing that.
                I was -- I think Mr. Sottile gave a wonderful
explanation of the EGI-TRB Zell position of the movants and
the committee.  Mr. Bradford is a very talented lawyer.  He
has appeared in front of you countless times with one goal
and one goal only: to make sure that his clients do not end
up on the wrong side of a V in a Tribune-related lawsuit.
But I don't think it's appropriate for potential defendants
to be able to dictate to the plaintiffs, to the estates, and
to the creditors who possess these claims, when these claims
can be brought, when they should be brought, and any
limitations on bringing them.  Because if that was the case,
every defendant would have a field day in trying to dictate
the contours of a potential litigation.

93

And finally, with respect to the retirees, I will have to reiterate. I don't know what was in the mind of the retirees when they cut their settlement with the DCL plan proponents, but what I find hard to understand or appreciate is that the DCL plan always contemplated -- always contemplated -- the ability of creditors to prosecute, either individually or through a trust into which they would put their claims, state law constructive fraudulent conveyance claims. Now, the DCL plan, I think as Your Honor may recall, does have a limitation that the first $100,000 is protected. But I'm just surprised that Mr. Teitelbaum said that they -- he and his clients -- were unaware of the fact that, once they cut their settlement, there may be a possibility that some of his clients -- actually, he hasn't said who -- but some of his clients may be defendants in these creditor-sponsored state law constructive fraudulent conveyance claims, because the DCL plan always contemplated that possibility.

Excuse me, Your Honor. That's all I have.

THE COURT: All right. Thank you.

MR. BRADFORD: Yes, Your Honor. Very briefly, on EGI-TRB, first, to the extent there's any concern about step one, we're prepared to enter into a tolling agreement to address that. Clearly, this is a step-two issue only.

THE COURT: I know. That proposal didn't work

94

before.

MR. BRADFORD: It should work here. Let me just try to be practical about the whole set of EGI-TRB issues, so that we don't have to be ever-present in these proceedings and we can simply.

THE COURT: Oh, I suspect you're going to be here anyway.

MR. BRADFORD: Well --

(Laughter)

MR. BRADFORD: -- it's certainly not our desire, Your Honor. EGI-TRB has no assets, other than its claims against this estate. Nobody would stand to defend these claims on behalf of EGI-TRB if, upon confirmation and upon motion practice related to that confirmation, we had some clarification as to what, first of all, the rights of EGI-TRB are in connection with this plan. But more basically -- and something we do intend to bring before the Court. Most recently, there was, added to a complaint, and this was the subject of some of the standing litigation that we tried to pursue and that was ultimately withdrawn, an allegation that EGI-TRB's corporate status should be pierced and that Mr. Zell should somehow be liable personally for that. There's no factual allegation for that. It does not comply with Rule 11. It is something that we think the Court will strike. And if stricken, we could be done here. There is

95

no reason for us to have to stand and defend all of this, because again, the only assets are the notes that we referred to previously, which are claims against the estate.

And so, I think that there is practical value in deferring further litigation until the plan confirmation issues are resolved. And insofar as this is really a step-two set of issues in any event, we don't think there's a hurry, and we're prepared to give whatever comfort people need to make sure that there's not a preclusive outcome to being able to have that further dialogue.

So thank you, Your Honor.

THE COURT: Thank you.

MR. LeMAY: Your Honor, I might have just a few sentences?

THE COURT: Certainly.

MR. LeMAY: Just because I wanted to get in, David LeMay for the committee again, and I apologize for tag-teaming with Mr. Sottile. We have a division of labor.

Just two very brief thoughts, Your Honor.

First, to the extent the Court were inclined to entertain the idea of not deciding this right now, today, but instead a brief adjournment, the committee, for its part, would have no problem with that.

Second, the proposition was raised that if relief is granted from the stay today, it ought only to be in favor

96

of the movants, and that, I think, is probably not something we could agree with. One of the reasons we got involved in this whole motion was to make sure that there was a level playing field for all creditors. And as is often the case in lift/stay jurisprudence, there is a concern that you don't put one person in a position that others similarly situated can't take advantage of.

So I would urge the Court that if relief from the stay is to be granted today, that it be for the benefit of everyone and not just these movants, and that's the way the current form of order that Mr. Golden tendered --

THE COURT: I know, but --

MR. LeMAY: -- reads.

THE COURT: -- let me ask you this. As a -- well, I'll put it in terms of the 30,000-feet view. As a prudential matter, why would a Court grant relief to parties who are not asking for such relief?

MR. LeMAY: A fair point, Your Honor. I think it comes back to the way Section 362 works and the way that the section or the subpart of 362 on relief from the stay works, and you'll see that it says that the Court may grant from -- relief from the stay, such as by -- and I'm doing this from memory, and I apologize -- conditioning, annulling, or terminating the stay. I don't think the -- that the application of the automatic stay, with respect to unsecured

97

1  creditors, is one of those things where it's only the people
2  who ask for it that can be given relief.  You may determine
3  those are the only people who should be given relief.  I
4  guess what I'd like to suggest is that you've got the power,
5  and I would suggest you should, put everybody on the same
6  footing.
7         As I say, one of the very reasons we got
8  ourselves involved, after the motion was filed, was
9  precisely to make sure that other voices not in the
10 courtroom today were put on the same footing.  And I think
11 -- I do think that the architecture of Section 362 is
12 supportive of that.
13        THE COURT:  Thank you.
14        MR. LeMAY:  Thank you.
15        THE COURT:  All right.  Last word.
16        MR. TEITELBAUM:  Thank you, Your Honor.  Just
17 very quickly, just to address the point.  The stipulation
18 that was attached to both plans that was executed by the
19 retirees in paragraph seven, says that this -- that -- and
20 I'll -- let me just quote it:
21 "The debtors agree that, in consideration of the compromises
22 set forth herein, and upon the occurrence of the condition
23 of the effectiveness hereof, any and all claims of the
24 debtors and their estates"
25        And recall, at the time this was done, these

98

1  constructive fraud claims were claims of the estate, and at
2  the time of the amended plan
3  "known or unknown, which may exist against any retiree
4  claimant, with respect to such claimant retiree claim,
5  including without limitation, any claim for the avoidance
6  and recovery of any pre-petition payment or transfer made on
7  account of such retiree claim shall be hereby released and
8  waived."
9         The concept of this specific stip was built into
10 the plan in the definition of retiree release claims in
11 11.1.2 and 11.2.  What I'm suggesting to you -- and maybe I
12 misstated it, and maybe I wasn't clear -- wasn't only what
13 was in the retirees' mind.  Your Honor, it was never within
14 the contemplation of the parties.  And I understand this may
15 not be before the Court today, and this is the chaos point I
16 was trying to avoid.  It may well be that it has to be teed
17 up as to whether the implications of what is being asked for
18 today was fully, fairly, adequately disclosed to people when
19 they made their vote.  And I think that circumstances, that
20 have been presented to this Court today, show that there is
21 some, at least basic, disagreement amongst some very, very
22 smart people as to the implications of the words in the
23 disclosure statement and on certain creditors who voted.
24 And that's what I'm suggesting.  I'm not suggesting it's
25 before you.  I'm suggesting I'm trying to avoid having that

99

1  be brought before you, so that we can all try to work
2  through this issue.
3         THE COURT:  All right.  Thank you.  All right.
4  Since the circumstance in which, arguably, the movants here
5  could've just went and done what they wanted to do without
6  asking the Court, but they didn't, so if I'm to enter an
7  order, my inclination is to make it sufficiently clear that
8  I'm not disposing of substantive rights.  I'm not making a
9  determination of what happens to state law fraudulent
10 conveyance claims upon the expiration of the estate's
11 ability to pursue them, but without standing in the way of
12 such actions.  So let me just, as I look over the various
13 proposed orders, tell you what I would be willing to
14 consider.  I will give counsel a chance to confer and to
15 submit, excuse me, a form of order which would address these
16 issues.  And to the extent the parties cannot agree, then
17 I'll consider competing forms of order.
18        So, not in any particular order, let me just make
19 the following comments.  And I'll work, initially, from the
20 most recently marked-up proposed form of order that Mr.
21 Golden handed me.
22        I would be willing to say something like pursuant
23 to -- well, the failure of the estate to pursue such claims,
24 that creditors have regained the right, if any, to prosecute
25 their respective creditors SLCFC claims.  And I'll stop

100

1  there to say that I'd like -- because I know these orders
2  will come up in state courts, all of the defined terms to be
3  explained in the body of the order itself so that courts
4  don't have to look elsewhere to find out what the order
5  means.
6         With respect to the -- whether a creditors SLCFC
7  claim is or was no longer property of the estate, I don't
8  want to make that declaration, because I'm not sure it ever
9  was.  but again, I'm willing to sign an order that makes it
10 clear that this Court is not standing in the way of anyone
11 who has a right to prosecute such a claim, and that the
12 estate has -- I don't know what the appropriate word is to
13 describe it -- failed to pursue, forfeited -- however
14 counsel can work that out -- the right to pursue it, here in
15 the bankruptcy court.
16        I think, with respect to the stay issue, I think
17 whatever paragraphs are built into an order -- I don't want
18 to make a declaration that 362 doesn't bar the commencement,
19 but I would be willing to say, to the extent the stay does
20 apply, it's lifted, solely to permit the commencement of
21 such litigation.  But I would like the memorialization,
22 until further order of this Court -- and I'll tell you why
23 in a moment -- that no litigation should be pursued or
24 prosecuted, because I am concerned about whether there would
25 be implications with respect to any decision I might make in

101

connection with confirmation of a plan, and I want to reserve, to myself and to the parties who have objected to confirmation, to make whatever arguments they have to make without being hampered by an order that I'm entering here. I don't mean to dispose of any of those rights.

The bridge lenders proposed order was more specific in terms of reserving rights, specifically in their proposed paragraph seven, I think you added there eight. And I think that covers the extent of the relief that's been requested. And any objections that have been raised, I now overrule, again subject to not impairing anybody's right to assert a confirmation objection.

Now, are there any questions?

(No audible response)

THE COURT: Shocking. I haven't been that clear in weeks.

(Laughter)

THE COURT: Okay. What I'll do, for calendar purposes, is continue the hearing on this motion to the April 11 date, which is the resumption of the confirmation hearing, but we'll expect, in the interim, that counsels should be able to confer and submit, hopefully within the next week or so, a proposed form of order, with a disk, please. Any questions about that?

MR. ALBERTO: Your Honor, no questions. Thanks

102

very much. I don't have any interest in this matter, if I could be excused.

THE COURT: Certainly.

MR. ALBERTO: Thank you.

THE COURT: Okay. We'll take just a five-minute break, and I'll -- we'll finish what's on the agenda.

(Recess at 12:10 p.m. to 12:17 p.m.)

THE CLERK: All rise. Please be seated.

THE COURT: Did you address number 21 on the agenda?

MR. KANSA: Your Honor, Ken Kansa from Sidley Austin. We did skip over item 21, which was the 44th omnibus objection, inadvertently. The only matter we had, going forward on that point, was a status conference with respect to the claim of Ms. Carol Walker [ph]. The -- we spoke with Ms. Walker on Friday, and she has agreed to continue to her claim, to the best of our knowledge, or we agreed to continue our objection, and she agreed to our continuance. So as a result, we are not proposing to go forward with the status conference on that today. We also had a response, at the end of the day yesterday, from Software AG --

THE COURT: I saw it this morning.

MR. KANSA: And we have agreed to continue the objection with respect to that claim as well. We will

103

submit a revised form of order under certification of counsel.

THE COURT: Okay. Thank you.

MR. KANSA: Thank you, Your Honor.

THE COURT: Okay. Let's turn, lastly, to the debtors' motion concerning advancement of defense costs. Let me ask first, though. Is the committee still pressing its position?

MR. SEIFE: Good afternoon, Your Honor. Howard Seife from Chadbourne & Parke for the committee. Pressing our position on a request for an adjournment or as to the merits?

THE COURT: Yes.

(Laughter)

MR. SEIFE: Yes, we are, Your Honor.

THE COURT: Okay. Okay. Let me give you my reaction here. You know, we face these types of issues all the time. Now, I haven't read the specific policy, but if what the debtor says here is true, not only is there discreet side A coverage, but a provision which says who gets paid first. And if that's true, unless -- well, I mean, that, 99 percent of the time, answers the question. So putting aside the alleged need for further discovery, because I know the debtor says why that's not necessary, what's different about this situation that I'm missing here?

104

MR. SEIFE: Your Honor, the line of cases, which Your Honor is very familiar of -- familiar with and cited by the parties, I think what's striking about them, in each case, the Court had a fairly fixed and specific idea of what the claims were that were going to be paid. And if you go through each of those cases, whether it's -- and from this district -- Allied Digital, World Health, Downey. If you read those opinions, before the Court was a factual showing of exactly what the claims were that were going to be paid. And I know it's easy to dismiss the motion -- or grant the motion on the basis that the proceeds are not property the estate, and we don't challenge that, as a conceptual matter. But the policies themselves are property of the estate. And every dollar that goes out to pay defense costs is a dollar taken away from potential recoveries down the road for creditors or --

THE COURT: Okay. So there's --

MR. SEIFE: -- from Tribune's --

THE COURT: There's a reduction in the overall coverage if there's a side A payment.

MR. SEIFE: Yes.

THE COURT: Okay. Even so, is there, in fact, the -- you know, a priority-of-payment provision in the policy?

MR. SEIFE: There is a priority-of-payment